**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Rocco Richard DeSANTIS, aka Rick
DeSantis, Defendant–Appellant.**

No. 86–5194.

United States Court of Appeals,
Ninth Circuit.

Submitted Oct. 31, 1988.

Decided March 16, 1989.

Michael J. Treman, Santa Barbara, Cal., for defendant-appellant.

Frank J. Marine, U.S. Dept. of Justice, Los Angeles, Cal., for plaintiff-appellee.

Before FLETCHER, ALARCON and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Rocco Richard DeSantis ("DeSantis") was convicted of violating 18 U.S.C. app. § 1202(a)(1), possession of a firearm by a felon. On appeal, DeSantis claims that the district court erred by admitting into evidence both the firearm in question and statements made during a verbal exchange between U.S. marshals and himself.

I

On June 29, 1984, DeSantis was convicted of conspiring to distribute heroin, in violation of 21 U.S.C. § 846, and possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). This court affirmed the conviction on May 29, 1985, 765 F.2d 150, and DeSantis sought review from the Supreme Court. In the interim, DeSantis was free on appellate bond. On June 5, 1985, the district court, finding him to be a flight risk, revoked DeSantis' bond and issued a warrant for his arrest.

On September 13, 1985, Inspectors Martino ("Martino") and Woolsey ("Woolsey") went to DeSantis' residence to execute the arrest warrant. The inspectors entered the living room of his apartment after identifying themselves as U.S. marshals and explaining that they had a warrant for his arrest.

The inspectors told DeSantis that the court had revoked his bond and had issued an arrest warrant. Woolsey then cursorily searched DeSantis while Martino conducted a brief security sweep of the apartment and determined that no one else was in the apartment. According to the inspectors, Woolsey read DeSantis his *Miranda* rights, which DeSantis indicated he understood.

At this point, DeSantis asked if he would be going to court. When told that he was, he asked if could change his clothes, because he was barefoot and wearing jogging pants and a T-shirt. He indicated that his clothing was in the adjoining bedroom. In response to this question, Martino asked whether there were any weapons in the bedroom. DeSantis stated that "there was a gun on the shelf in the closet." The inspectors accompanied DeSantis, who was not handcuffed, into the bedroom to get the clothes. DeSantis indicated that the revolver was in the closet, which was two to three feet away from him. Martino seized the loaded .38 caliber revolver from an unzipped pistol case on the closet shelf. According to the inspectors, "[a]s soon as [Martino] retrieved the gun from the shelf, [DeSantis] volunteered that he had received the gun as part of a [sic] inheritance from his father." *Id.* The inspectors then gave DeSantis some clothing from the closet after searching them.

The inspectors claim that at no time at the apartment did DeSantis request an attorney or suggest that he wanted to remain silent. As they were all leaving the apartment, however, DeSantis did ask for his telephone book to get his attorney's telephone number, which he was given. DeSantis, in his testimony, disagreed, stating that he asked to call his lawyer as soon as the inspectors entered the apartment in order to "see if the matter could be straightened out, but was refused."

The district judge initially granted DeSantis' request to suppress the statements to the inspectors and denied his request to suppress the gun. The judge later overturned her ruling suppressing the statements, thereby denying DeSantis' suppression motion in its entirety.

The district court conducted a bench trial and found DeSantis guilty of violating section 1202. Judgment was entered on July 7, 1986, and DeSantis filed a timely notice of appeal on July 17, 1986. This court has jurisdiction under 28 U.S.C. § 1291.

II

DeSantis' claim on appeal is that the statements and the firearm were errone-

ously admitted into evidence in violation of his constitutional rights under the fifth and sixth amendments. According to DeSantis, his asserted desire to speak with counsel mandated total cessation of further questioning, including questions solely intended to secure the inspectors' own safety.

We are called upon in this case to decide whether the "public safety" exception, first articulated in *New York v. Quarles*, 467 U.S. 649, 657, 104 S.Ct. 2626, 2632, 81 L.Ed. 2d 550 (1984), applies to the situation in which an accused asserts a right to speak with counsel. This question of first impression requires us to determine whether the considerations undergirding *Quarles* necessitate relaxation of certain procedural safeguards enunciated in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Our review of this legal issue is de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### III

DeSantis contends that his asserted right to speak with his lawyer prior to being questioned[1] defeats the government's argument that he voluntarily waived his *Miranda* rights by speaking with the inspectors. For support, DeSantis relies on *Edwards* and *Jackson*, which established a stringent waiver standard when there is a request for counsel.[2] Because we find that the procedural protections erected in *Edwards* and *Jackson* must give way to the overriding concerns of public safety in this case, we reject DeSantis' contention.

### A

In *Quarles* a rape victim approached the car of two police officers, exclaiming that she had been sexually assaulted. She described the rapist and explained that he just entered a nearby supermarket carrying a gun. The officers rushed to the supermarket and spotted the rapist. One of the officers seized and frisked him. The officer noticed that he wore a shoulder holster, which was empty. The officer handcuffed him and asked where the gun was. The rapist, nodding in the direction of an area in the supermarket, stated that "the gun was over there." Against the rapist's objections, his gun and his statement about the gun's location were admitted into evidence. He argued that the officer violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by questioning him before notifying him of his rights. The New York trial court and courts of appeals agreed and suppressed both the statement and the gun.

On appeal to the Supreme Court, the case was reversed. The Court engrafted a

---

**1.** The parties dispute whether DeSantis actually requested to speak with counsel. The record in this case is not dispositive. Our holding, however, obviates the need to resolve this disagreement. We will credit DeSantis' version of this event, but conclude that nevertheless the district judge correctly refused to suppress the evidence.

**2.** Addressing a claim of a fifth amendment violation, the Court held in *Edwards* that "an accused person who has 'expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85. In *Jackson* the Court was asked to extend the rule in *Edwards* to the sixth amendment context (namely, where a defendant has been formally charged and has requested appointment of counsel at his arraignment). The Court agreed and held: "[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Jackson*, 475 U.S. at 636, 106 S.Ct. at 1411.

Hence, *Edwards* and *Jackson* established that a request for counsel triggers certain procedural safeguards to protect an individual's fifth and sixth amendment liberties. After the accused has asserted his right to counsel, the waiver standard becomes considerably more stringent: the court must find that the suspect "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984) (per curiam), *quoted in, Connecticut v. Barrett*, 479 U.S. 523, 527, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987).

"public safety" exception onto the *Miranda* rule, holding that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." This exception applies to exigencies involving the safety of both the public at large and the officers on the scene. *Quarles*, 467 U.S. at 658–59, 104 S.Ct. at 2632–33.

### B

In urging this court to find the "public safety" exception inapplicable to the facts of this case, DeSantis seeks to distinguish *Quarles*. He notes the following dissimilarities: (1) the inspectors had no reason to suspect that a gun might be present and had no reason to fear DeSantis; (2) the arrest did not occur in a public place; and (3) *Miranda* warnings were given to DeSantis.

### 1

As DeSantis himself recognizes, however, most of these differences are not significant in light of our decision in *United States v. Brady*, 819 F.2d 884 (9th Cir. 1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). In *Brady* the police stopped the defendant, who was suspected of having recently assaulted a woman. An officer ordered him out of his car, frisked him, and found no weapons. Before giving the defendant his *Miranda* warnings, the officer asked, among other things, if he had a gun in the car. After the defendant responded that he had a gun in the trunk, the officer searched the trunk and found the gun and other contraband. The district court denied the defendant's suppression motion.

We affirmed *Brady's* conviction on appeal. This court held that the *Quarles* exception excused the officer's failure to read the defendant his rights. The court rejected as legally insignificant the following factual distinctions between that case and *Quarles:*

> In *Quarles*, an eyewitness told police that Quarles was armed. No one said Brady was armed. In *Quarles*, the arresting officer saw Quarles' empty holster. There was no similar indication that Brady possessed a weapon. In *Quarles*, the officer had reason to believe that Quarles had disposed of his gun where it posed a public danger. [The officer in the present case] had no reason to think that Brady had placed an unguarded weapon in a public place.

*Id.* at 888.

After *Brady*, two of DeSantis' three distinctions are untenable. The fact that the inspectors had no reason to believe that DeSantis was armed and dangerous, as did the police in *Quarles*, is of no consequence. Similarly, the mere fact that the arrest did not take place in public does not distinguish *Quarles*. The Court framed the relevant inquiry as whether there was "an objectively reasonable need to protect *the police* or the public from any immediate danger." *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 n. 8 (emphasis supplied). The "public safety" exception, therefore, was intended to protect the police, as well as the public, from danger. *See also Brady*, 819 F.2d at 888 (finding insignificant the fact that the officer had no basis for believing that the defendant unloosed a gun in a public place). It is therefore inconsequential that DeSantis was arrested in a private setting.[3]

### 2

DeSantis' final suggested distinction—that *Miranda* warnings actually were given in this case—cannot be resolved by referring to *Brady*. The officer in *Brady* never advised the defendant of his *Mi-*

---

**3.** DeSantis concludes that "the only position which can support the application of the public safety exception in this case is a position which holds that when police officers take a suspect into custody, they can question him concerning the presence of a gun (and probably any weapon) within the vicinity of his arrest location." This conclusion is based on the faulty premise that the inspectors faced no greater danger "beyond that which might occur in any arrest situation in a person's home." DeSantis' request to go into the bedroom presented the inspectors with a legitimate security concern that he might obtain a weapon in that room.

*randa* rights prior to questioning him. DeSantis appears to argue that *Quarles* merely allows the police to dispense with the *Miranda* warnings in times of a threat to public safety. He concludes that since he was informed of his *Miranda* rights, the *Quarles* exception has no meaning in the context of this case. The government, in contrast, attempts to provide a much broader scope to the "public safety" exception. In the introduction to its discussion of *Quarles*, the government contends: "Even assuming *arguendo* that appellant did not knowingly and voluntarily waive his Fifth and Sixth Amendment rights guaranteed under *Miranda v. Arizona* and its progeny, appellant's two statements at issue were admissible on wholly independent grounds." According to the government, therefore, *Quarles* not only allows the police to dispense with providing the *Miranda* warnings, it also dispenses with the need for obtaining voluntary and knowing statements.

### a

■ The *Quarles* decision does not warrant the conclusion that the "public safety" exception allows the police to obtain involuntary, or coerced, statements in exigent circumstances. The Court specifically disclaimed such a holding: "In this case we have before us no claim that respondent's statements were actually compelled by police conduct which overcame his will to resist." *Quarles*, 467 U.S. at 654, 104 S.Ct. at 2630. Rather, *Quarles* merely addresses the "knowing and intelligent" aspects of the requirements for waiver of constitutional rights.[4] *See Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 1296, 84 L.Ed. 2d 222 (1984) ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."). In exigent circumstances, the Court's prudential policy of requiring *Miranda* warnings to ensure that any waiver of fifth and sixth amendment rights will be informed, or intelligent, is outweighed by the need for the

police to act decisively and promptly. *Quarles*, 467 U.S. at 657–58, 104 S.Ct. at 2632–33. The Court has not extrapolated from this holding that officers can compel self-incriminating statements. *See Elstad*, 470 U.S. at 310, 105 S.Ct. at 1293 ("The failure of the police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised.") (citing *Quarles*, 467 U.S. at 654, and n. 5, 104 S.Ct. at 2630, and n. 5). While informing the accused of his rights is not a constitutional mandate, preventing coerced self-incriminating statements clearly is. *See Quarles*, 467 U.S. at 654, 104 S.Ct. at 2630. ("The prophylactic *Miranda* warnings ... are not 'themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.' ") (quoting *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974)). Hence, the government is mistaken that the inspectors constitutionally could have obtained involuntary statements from DeSantis.

### b

■ The thrust of the *Quarles* decision is its recognition that certain exigencies require the courts to relax rules that act as prophylactic safeguards of the right against compelled self-incrimination. Thus, although *Miranda* warnings help ensure that the accused will make an informed waiver of his rights, this goal is overridden when a threat to the public safety is posed. The stringent waiver standard established in *Edwards* and followed in *Jackson* also was designed as a " 'prophylactic rule' ... to prevent the police from effectively 'overriding' a defendant's assertion of his *Miranda* rights by 'badgering' him into waiving those rights." *Jackson*, 475 U.S. at 638, 106 S.Ct. at 1412 (Rehnquist, J., dissenting) (quoting *Solem v. Stumes*, 465

---

**4.** In the public safety context, *Quarles* also eliminates the presumption of coercion that normally results from a failure to provide the *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1984).

U.S. 638, 644, 645, 104 S.Ct. 1338, 1342, 1343, 79 L.Ed.2d 579 (1984) and *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983)); *see also Arizona v. Roberson,* —— U.S. ——, 108 S.Ct. 2093, 2101–02, 100 L.Ed.2d 704 (1988) ("But the rule of *Edwards* is our rule, not a constitutional command....") (Kennedy, J., dissenting); *Solem,* 465 U.S. at 644 n. 4, 104 S.Ct. at 1342 n. 4 ("Like ... *Miranda* ..., *Edwards* did not confer a substantive constitutional right that had not existed before; it 'created a protective umbrella serving to enhance a constitutional guarantee.' ") (citation omitted). Indeed, the Court recently has made clear that the "prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1986) (citing *Quarles* ).

The same considerations that allow the police to dispense with providing *Miranda* warnings in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further questioning of an accused who requests counsel. The Court noted in *Quarles:*

> Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles.

*Quarles,* 467 U.S. at 657, 104 S.Ct. at 2632.

This reasoning would apply with equal force to the procedural safeguards established when the accused asks for the aid of counsel. Society's need to procure the information about the location of a danger-ous weapon is as great after, as it was before, the request for counsel. Moreover, the concern for protecting the accused from police "badgering" is lessened in the context of a public safety threat. The police officers' questions generally will be motivated by the necessity "to secure their own safety or the safety of the public" rather than "to elicit testimonial evidence from a suspect." *Id.* at 659, 104 S.Ct. at 2633. Therefore, the focus should be on whether, under the circumstances, the statements were obtained coercively, disregarding the *Edwards'* prophylactic rule.

■ Viewing the totality of the circumstances in the present case, the inspectors cannot be said to have coerced DeSantis into revealing that there was a gun in the bedroom. First, DeSantis was questioned in his own home, which is a considerably less coercive environment than the police station. Second, Martino questioned DeSantis about a weapon only in response to DeSantis' request to enter the bedroom. Finally, viewed objectively, Martino's question was not intended to elicit testimonial evidence, but rather to secure the inspectors' own protection.

## IV

We conclude that the public safety exception applies to the facts of this case. Accordingly, DeSantis' constitutional rights were not violated when the inspectors questioned him about the possibility of weapons located in the bedroom. The inspectors lawfully were entitled to question DeSantis for the purpose of securing their safety, even after he had asserted his desire to speak with counsel. DeSantis' decision to respond to the questioning was voluntary. As a result, the statements and the firearm properly were admitted into evidence.

AFFIRMED.