OPINION
This timely appeal arises from a jury verdict finding Appellant guilty of aggravated murder. For the following reasons, this Court affirms the jury verdict and overrules Appellant's assignments of error.
Shortly before 7:00 p.m. on December 11, 1995, in East Liverpool, Columbiana County, Ohio, Willie Coleman, an off-duty Columbiana County Sheriff's Deputy, exited his house on Morton Street and heard a crashing sound followed by a woman screaming. (Tr. 165-166.) Coleman observed his neighbor, Alice Timmons, run from her house and down the middle of the street holding her child. (Tr. 166.) Appellant, Keith I. Davis, II, pursued Alice down the street and eventually took hold of her right arm. (Tr. 168, 170-171.) Appellant and Alice made their way closer to Coleman's house where Alice stated to Coleman that Appellant, "* * * is going to do something to me." (Tr. 171.) Coleman inquired as to what was occurring and Appellant responded, "Nothing. Nothing man." (Tr. 173.) Coleman then noticed that Appellant was concealing a gun behind his back and advised Appellant to put it down and to not do anything "stupid." (Tr. 173.)
After Coleman made several more attempts to persuade Appellant to drop the gun, Appellant began to slowly retreat away from Coleman. (Tr. 174.) Coleman then went into his house to retrieve his off-duty weapon and to contact the East Liverpool Police Department. (Tr. 175.) After Coleman contacted the police and while still in his house, he heard two gun-shots. (Tr. 175.) Coleman ran outside and saw the child standing alone in the middle of the street crying. (Tr. 176.) Coleman grabbed the child and turned around to see Alice lying on the ground behind his truck which was parked in the street. (Tr. 176.) Alice was bleeding from her head and, according to Coleman, had no pulse. (Tr. 176.) Coleman then took the child to his house, gave the child to his wife and instructed her to contact the police department and request an ambulance. (Tr. 177.) Coleman then returned to the street to wait for the police and to see if Appellant was still in the area. (Tr. 176-177.)
At 7:19 p.m. that evening, Appellant walked into the East Liverpool Police Department and advised Dispatcher Ron Brooks that the police were looking for him. (Tr. 245, 246.) When Brooks asked why the police were looking for him, Appellant stated that he had just shot his girlfriend. (Tr. 245.) About that time, Chief Michael McVay of the East Liverpool Police Department, who was then off-duty, entered the police station to retrieve something that he had left in his office. (Tr. 267.) McVay casually asked Brooks what was going on and Brooks responded that there had been a shooting. (Tr. 267.) Brooks motioned to Appellant who was standing at the counter next to McVay and indicated that Appellant was the offender. (Tr. 267.) Appellant then stated, "I'm the one who shot her." (Tr. 267.)
McVay asked Appellant if he had the gun at that time and Appellant responded that he did not. (Tr. 268.) McVay conducted a pat-down search and confirmed that Appellant was unarmed. (Tr. 268.) McVay then asked Appellant where the gun was at and Appellant responded that he had thrown it in a ditch. (Tr. 268.)
Upon McVay's request, Appellant entered the squad room where McVay read the Miranda rights directly from a Miranda card to Appellant. (Tr. 269-270.) When McVay asked Appellant if he understood his rights, Appellant responded, "I'm not sure." (Tr. 270.) McVay then re-read the Miranda rights to Appellant who then indicated that he understood them and asked McVay, "Can I continue my statement?" (Tr. 270.)
Appellant stated that he and Alice were fighting and that she had thrown a telephone at him. (Tr. 271.) Appellant then stated that he heard glass break and observed Alice running across the street towards Deputy Coleman's house. Appellant said that he followed Alice to Coleman's house and that he was holding her from behind. (Tr. 272.) Appellant then claimed that "I knew [Coleman] was going in the house to get his gun, I knew he was going to kill me." (Tr. 272.) Appellant stated that he tried to drag Alice back to their house when they stumbled down a small hill. (Tr. 272.) Appellant said that, "I pushed the baby away with my right hand, then [Alice] got shot." (Tr. 272.) McVay asked Appellant whether the shooting was an accident; Appellant responded, "I shot her and I'll have to take responsibility for it." (Tr. 272.)
McVay proceeded to question Appellant concerning the gun used in the shooting. Appellant told McVay that the gun he used was a .45 caliber pistol. (Tr. 273.) McVay then asked Appellant if it was possible that a child could find the discarded gun and Appellant responded, "Yes, I'm sure somebody is going to find the gun." (Tr. 273.) Appellant then informed McVay that the gun was behind the Kent State University East Liverpool Campus. (Tr. 273.) Appellant agreed to show McVay where he hid the gun and reiterated that, "Somebody is going to find the gun." (Tr. 273.) When they were gathering their coats to drive to the location, Appellant stated to McVay, "I think I ought to have an attorney." (Tr. 273.) McVay stated that he ceased questioning Appellant at that point although he then asked Appellant whether he was still willing to show him were the gun was. (Tr. 274.) Appellant said "Yes" and restated that he believed somebody was going to find the gun. (Tr. 274.) Appellant directed McVay and another officer to the location of the gun. (Tr. 274.) Appellant indicated that the gun was under. a piece of old carpet, which McVay pulled back to discover a AS caliber pistol, a 9 mm pistol and a 9 mm bullet cartridge. (Tr. 275-276,) Both guns were empty and their magazines were missing. (Tr. 276.)
Alice Timmons died on the night of the shooting as a result of two gun shot wounds to her face.
On January 23, 1996, the Columbiana County Grand Jury indicted Appellant on aggravated murder with a firearm specification. On January 29, 1996, Appellant waived his right to a speedy trial and pled not guilty to the charge against him. On May 15, 1996, Appellant filed a motion to suppress/motion in limine. Appellant argued that any statements he made to police or any evidence obtained as a result of his interrogation should be suppressed as they were obtained in violation of his constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article One of the Ohio Constitution.
After a hearing on the motion, the trial court denied Appellant's request. At issue was whether Appellant's statement, "I think I ought to get an attorney," constituted an invocation of his right to counsel and whether Chief McVay's subsequent inquiry as to whether Appellant would still show the police where the gun was located violated Appellant's right to counsel. The court found that McVay's question as to whether Appellant desired to take police to the gun (after he purportedly requested counsel) was out of concern for the safety of other individuals, including children, who may have found the gun. The court also stated that Appellant's purported invocation of his right to counsel was too vague and thus did not "necessarily" constitute a request for counsel.
At trial, a jury found Appellant guilty of aggravated murder with a firearm specification. On June 21, 1996, the trial court sentenced Appellant to three years actual incarceration on the firearm specification and to life imprisonment on the aggravated murder. These sentences were to be served consecutively.
On July 2, 1996, Appellant filed his notice of appeal. While his appeal was pending, Appellant requested the appointment of new appellate counsel stating his dissatisfaction with the appellate counsel originally appointed and that counsel had a serious conflict of interest. We granted Appellant's request. Appellant's new counsel filed a motion to supplement the record seeking this Court to order the preparation of a transcript of the suppression hearing which Appellant's original appellate counsel had not requested. However, at oral argument, counsel withdrew that motion based upon a stipulation that this Court would accept the trial court's factual findings at the suppression hearing as true.
Subsequent to oral argument, Appellant, pro se, filed a motion for leave to supplement his previously filed pro se brief. This motion was denied as the matter had been fully briefed and heard by the Court.
Appellant raises six assignments of error; three with the assistance of counsel and three pro se.
Appellant's first assignment of error alleges:
 "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE INTRODUCTION INTO EVIDENCE OF THE FIREARMS AND THEIR SUBSEQUENT TESTING, AS THE APPELLANT HAD CLEARLY INVOKED HIS MIRANDA AND SIXTH AMENDMENT RIGHT TO COUNSEL PRIOR TO CHIEF McVAY'S REINITIATION OF QUESTIONING, AND THE REOPENING OF SUCH INTERROGATION RESULTED IN DISCOVERY OF THE WEAPONS."
Appellant asserts that his statement, "I think I ought to get an attorney," was an invocation of his right to counsel requiring that subsequent interrogation cease. Appellant also argues that Chief McVay's inquiry as to the location of the gun did not fall into the public safety exception to allow violation of a suspect's rights. Appellant further argues that the public safety exception only applies to the obligation to read Miranda warnings to a suspect, not to his right to counsel.
An appellate court shall not disturb a trial court's decision on a motion to suppress when it is supported by competent, credible evidence. State v. Winand (1996), 116 Ohio App.3d 286,288, citing Tallmadge v. McCoy (1994), 96 Ohio App.3d 604, 608. On appeal the court shall accept the trial court's findings of fact if they are supported by competent, credible evidence. Statev. Kobi (1997), 122 Ohio App.3d 160, 168, citing State v.Guysinger (1993), 86 Ohio App.3d 592, 594. While accepting that the facts as found by the trial court are true, we must, "* * * independently determine as a matter of law, without deference to the trial court's conclusion, whether the facts meet the legal standards * * *" applicable to the case. State v. Brown (1996),116 Ohio App.3d 477, 481. In the present case, as counsel for Appellant stipulated at oral argument to the trial court's findings of fact at the suppression hearing, and as we are without the aid of a transcript of that hearing, we need only address whether the facts support the legal findings of the trial court.
In Miranda v. Arizona (1966) 384 U.S. 436, the United States Supreme Court held that an individual subjected to custodial interrogation must be informed of his right to remain silent and of his right to have counsel present during questioning. Id., 467-471. Questioning must cease if an individual invokes these rights at any time prior to or during questioning. Id., 473-474. When an individual indicates his desire to have counsel present, authorities may continue interrogation only if, "* * * the accused himself initiates further communication, exchanges, or conversations with police." Edwards v. Arizona (1981)451 U.S. 477, 484-485. This, "`rigid' prophylactic rule" requires the court to, "* * * determine whether the accused actually invoked his right to counsel." Smith v. Illinois (1984), 469 U.S. 91, 95.
In Davis v. United States (1994), 512 U.S. 452, the United States Supreme Court decided whether the statement, "Maybe I should talk to a lawyer" was an actual invocation of the right to counsel. In finding that the statement was not a sufficient invocation, the Court held that a suspect must unambiguously request counsel:
 "* * * he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect."
Davis v. United States, 459.
In State v. Hennes (1997), 79 Ohio St.3d 53, the Ohio Supreme Court followed Davis and held that the suspect's statement, "I think I need a lawyer * * *" was as ambiguous as the statement made by the Davis suspect. State v. Hennes, 63.
As such, Appellant's statement in the present case, "I think I ought to get an attorney," could be viewed by a reasonable police officer under the circumstances as ambiguous and thus not to be seen as a clear invocation of his right to counsel. However, we are not pressed to make such a determination. The record demonstrates that Chief McVay did, in fact, interpret Appellant's statement as an invocation of his right to counsel. In its judgment entry denying Appellant's motion to suppress, the trial court found that after Appellant made reference to an attorney, Chief McVay stopped questioning Appellant with respect to the crime. The trial court stated that, "Chief McVay intentionally stopped questioning the Defendant, in any other manner, in regard to the alleged crime after [Appellant's] statement with regard to counsel." Rather, the court found that McVay's questioning of Appellant subsequent to invoking his right to counsel was out of concern for public safety. The trial court's judgment entry made no direct application of the law as stated in Davis; rather, the court merely restated its holding that a vague reference to an attorney does not "necessarily" constitute a request for an attorney.
As the trial court found that McVay, as a reasonable police officer, believed that Appellant invoked his right to counsel, we must now determine whether McVay's further inquiry into the location of the gun was within the "public safety" exception to a suspect's Miranda rights or amounted to an impermissible violation of his constitutional rights.
In New York v. Quarles (1984), 467 U.S. 649, the police apprehended a rape suspect and discovered he was wearing an empty shoulder holster. Id., 652. Prior to reading his Miranda rights to the suspect, an officer asked the suspect where the gun was located. Id. The suspect nodded toward some empty cartons and stated "the gun is over there." Id. Deciding the issue as to whether such questioning violated the suspect's Miranda rights, the United States Supreme Court held that:
 "* * * there is a `public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved."
Id., 655-656. The Supreme Court further stated that:
 "Whatever the motivation of the individual officers in such a situation, we do not believe that the doctrinal underpinnings of Miranda require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety."
Id., 656.
The Court explained that had Miranda warnings deterred the suspect from disclosing the location of the gun, "* * * the cost would have been something more than merely the failure to obtain evidence useful in convicting [the suspect]." Id., 657. The officer needed to know the location of the gun, "* * * to insure that further danger to the public did not result from theconcealment of the gun in a public area." Id., (emphasis added.) The facts of the present case are similar to those in Quarles,supra. Appellant concealed his weapon in a public area and the police were motivated by concern for public safety. (Tr. 274.) In fact, according to Chief McVay's testimony, Appellant also expressed concern that someone may find the weapon. (Tr. 273-274.)
However, unlike in Quarles, the relevant question was asked of Appellant subsequent to his being read Miranda rights. We must now determine whether the "public safety" exception of Quarles
applies once a suspect has received Miranda warnings. Neither the United States Supreme Court nor the Ohio Supreme Court has decided this issue. However, the Ninth District Court of Appeals of Ohio has applied the public safety exception in a situation where the suspect had already invoked his right to counsel.
In State v. Taylor (Dec. 16, 1992), Lorain App. No. 92 CA 5313 (unreported), the court relied on United States v. DeSantis (9th Cir. 1989), 870 F.2d 536 where the United States Court of Appeals, Ninth Circuit, held that this invocation of the safety exception was constitutional. In DeSantis, the court stated:
 "The same considerations that allow the police to dispense with providing Miranda warnings in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further questioning of an accused who requests counsel."
United States v. DeSantis, 541. The DeSantis court pointed to the decision in Quarles where the court stated:
 "Procedural safeguards which deter a suspect from responding were deemed acceptable in Miranda in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the Miranda
majority was willing to bear that cost. Here, had Miranda warnings deterred [the suspect] from responding to [the officer's] question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting [the suspect.]"
United States v. DeSantis, 541 quoting United States v. Quarles, 657. (Brackets added.) The DeSantis court stated:
 "This reasoning would apply with equal force to the procedural safeguards established when the accused asks for the aid of counsel. Society's need to procure the information about the location of a dangerous weapon is as great after, as it was before, the request for counsel."
United States v. DeSantis, 541. The court further stated that where police are primarily motivated by the necessity to secure their own and the public's safety, rather than to elicit testimonial evidence from a suspect, "* * * the focus should be on whether, under the circumstances, the statements were obtained coercively * * *." Id.
We are persuaded that the "public safety" exception to theMiranda rule extends to a situation where a suspect has been informed of his Miranda rights and invokes his right to counsel, but only in certain narrow circumstances. Logically, there is nothing to distinguish from the situation in Quarles, supra, where the suspect was asked questions relating to public safety after he requested an attorney but prior to being read his Miranda rights and the present case, where Appellant received his Miranda rights. In fact, the logic of Quarles was that the Miranda rights might have deterred the suspect from giving the location of the gun. In this instance, Appellant was undeterred by the Miranda warnings and voluntarily and without coercive tactics gave the location of the weapon. We stress, as did the court in DeSantis, that the need to protect the safety of the public does not diminish once a suspect has invoked his right to counsel. We also stress that our decision today is limited strictly to individualized facts of any given case and is not to be seen as a blanket approval of police questioning. Key to this decision is the complete lack of any allegations or evidence in the record that the questioning was in any way coercive and, in fact, the readiness of the suspect to verbally tell the police where the weapon was and offer to take them to it prior to his invocation of his right to an attorney.
In concluding that Chief McVay's questioning of Appellant subsequent to his invoking his right to counsel falls within the "public safety" exception to the Miranda rights, we note that the question asked was narrowly directed and was not coercive in any way. Chief McVay asked Appellant only the question necessary to locate the gun. See, New York v. Quarles, 659, where the arresting officer asked the suspect only the question necessary to locate the missing gun. Important to our decision is that Appellant had already indicated the generalized location of the gun to McVay prior to his statement regarding counsel. (Tr. 273.) Appellant had expressed to McVay a concern over the gun's location sufficient for McVay to be highly concerned that the gun might be loaded and easily found by some member of the public. Furthermore, as the trial court noted in its judgment entry overruling Appellant's motion to suppress, the record reflects that Appellant voluntarily showed police where the gun was located. It should also be noted that receipt of the gun for evidence purposes was in no way crucial to the police. There was a plethora of other evidence with which to convict Appellant, including the testimony of Deputy Coleman. Thus, while theQuarles, supra, decision tells us that the motivation of the police officers should not be a factor in applying the public safety exception, we are convinced that based on the record before us there is not even a question of improper motivation. For these reasons, Appellant's first assignment of error is without merit.
Appellant's second assignment of error alleges:
 "THE VERDICT OF GUILT [sic] OF AGGRAVATED MURDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AS THE EVIDENCE SHOWED APPELLANT NOT TO HAVE THE REQUISITE DEGREE OF INTENT TO COMMIT THAT OFFENSE."
Appellant argues that he presented uncontroverted expert testimony that he suffered from encephalopathy, a condition of mental disorientation brought on by his liver disease. Appellant argues that this condition was demonstrated by Deputy Willie Coleman's testimony that Appellant did not seem to comprehend what Coleman was saying to him and by the fact that Chief McVay had to repeat the Miranda warnings to him before he understood them. According to Appellant, this medical condition translates into an absolute lack of purposefulness, which is required to be convicted of aggravated murder.
Addressing the issue of "manifest weight", the Ohio Supreme Court has determined that "sufficiency of the evidence" and "weight of the evidence" are not synonymous legal concepts. Statev. Thompkins (1997), 78 Ohio St.3d 380, 386. This Court has held that when reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine the evidence admitted to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Demiduk (June 24, 1998), Columbiana App. No. 96-CO-16, unreported, citing State v. Jenks (1990),61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. To reverse a lower court conviction based on legally insufficient evidence, only a concurring majority of the court of appeals panel reviewing the judgment is necessary.State v. Thompkins, 389.
On the other hand, the weight of the evidence:
 * * * concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. * * *.'
Id., 387, quoting Black's Law Dictionary, (6th Ed. 1990), 1594. We will reverse on the weight of the evidence only after the state has presented both sufficient evidence to support a conviction and has persuaded the fact finder to convict. Id.,
388, citing Tibbs v. Florida (1982), 457 U.S. 31, 41-43. To reverse Appellant's conviction based upon the weight of the evidence, we must find that, "* * * the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172,175. For such a reversal, all three judges on the court of appeals panel reviewing the case must unanimously concur. Statev. Thompkins, 389.
Ohio's aggravated murder statute provides that, "No person shall purposely, and with prior calculation and design, cause the death of another." R.C. § 2903.01(A). Purpose may be deduced from all the surrounding circumstances, including the instrument used and its tendency to cause death if designated for that purpose and the manner of inflicting the fatal wounds. State v.Eley (1996), 77 Ohio St.3d 174, 180. In the present case, the murder weapon was a .45 caliber pistol; this is undisputedly capable of causing death. Furthermore, testimony at trial indicated that Appellant pursued the victim on foot and grabbed her by the arm before she could reach the deputy's house. (Tr. 168, 170-171.) Testimony also indicated that Appellant failed to comply with the deputy's plea for Appellant to drop his weapon. (Tr. 174-173.) The prosecution's witness from the Ohio Bureau of Criminal Investigation, Nancy E. Bulger, testified that the murder weapon required the operator to load a magazine and pull the slide back and release it in order to fire the weapon. (Tr. 574-575.) Bulger also testified that the operator would have to disengage a grip/magazine safety and pull the trigger twice in order to fire two shots. (Tr. 580.) Bulger further testified that one of the gun shot wounds that killed the victim was inflicted from a range of two to five inches while the other wound was inflicted from the gun being pressed against the victim. (Tr. 570-580.) From this, a rational trier of fact could conclude that Appellant acted with the requisite purpose.
Appellant argues that his medical condition prevented him from acting purposefully. At trial, Appellant presented the video-taped testimony of his physician, Dr. Geoffrey D. Block, who testified that Appellant was suffering from hepatitis C. and liver failure. (Tr. 644.) Dr. Block testified that when he examined Appellant on October 27, 1995, prior to the murder, he showed indications of liver failure and progressive liver disease. (Tr. 646.) Dr. Block testified that encephalopathy, a condition which causes confusion and disorientation, can accompany liver failure. (Tr. 646.) Dr. Block further testified that Appellant displayed encephalopathy at times before and after the murder on December 11, 1995. However, Dr. Block admitted that encephalopathy is not a constant condition but that, "Some periods of time will be worse than others." (Tr. 662.) Further, Dr. Block admitted that he had no knowledge what Appellant's condition was at the time of the murder. (Tr. 663.)
Appellant seeks to prove manifestation of his medical condition by the testimony of Deputy Coleman who stated that Appellant stared at him as though he did not comprehend what Coleman was saying. (Tr. 174.) Appellant also argues that the fact that he did not understand his Miranda rights at first was a manifestation of encephalopathy.
In light of the evidence presented at trial, and in the absence of any expert testimony that Appellant was in a state of encephalopathy-caused confusion at the time of the murder, we cannot conclude that, "* * * the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 387. Therefore, we find Appellant's second assignment of error to be without merit.
Appellant's third assignment of error alleges:
 "THE DEFENDANT WAS NOT AFFORDED AN IMPARTIAL JURY DRAWN FROM A CROSS-SECTION OF THE COMMUNITY."
Appellant argues that a defendant has a right to a trial to an impartial jury drawn from a cross-section of the community. Appellant states that the venire in his case consisted of members of a jury that returned a guilty verdict in a previous criminal trial and that six of those individuals were selected for his trial.
"The array of veniremen need not reflect an exact cross section of the community." State v. Lundgren (1995), 73 Ohio St.3d 474,480. Furthermore, a challenge to the array of a jury is waived, except as to plain error, unless raised at trial. State v.Lundgren, 480; Crim.R. 24(E).
In the present case, Appellant made no challenge to the jury array at trial and has waived his right to raise the issue on appeal. This assignment of error lacks merit.
Appellant's first pro se assignment of error alleges:
 "THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER. THE EVIDENCE AND FACTS CONTAINED WITHIN THE CASE SUPPORT THE REQUIREMENTS AND CRITERIA REQUIRED TO INSTRUCT THE JURY ON THIS LESSER INCLUDED OFFENSE. FAILURE TO GIVE THIS INSTRUCTION THEREBY SEVERELY PREJUDICED THE DEFENDANT, DEPRIVING HIM OF A FAIR TRIAL GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
The Ohio Supreme Court has stated that instruction on a lesser included offense, "* * * is required only where the evidence presented at trial could reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Goodwin (1999), 84 Ohio St.3d 331, 345 quotingState v. Thomas (1988), 40 Ohio St.3d 213, paragraph two of the syllabus. "An instruction is not required every time some evidence is presented. There must be sufficient evidence admitted at trial to allow the jury to reasonably reject the greater offense and find the defendant guilty on the lesser included offense." State v. Goodwin, 345 quoting State v. Shane (1992),63 Ohio St.3d 630.
R.C. § 2903.03 provides that:
 "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *"
The trial court found, and the record reflects, that there was no evidence of sudden passion or rage that would support a conviction of voluntary manslaughter. (Tr. 761-762.) This assignment of error lacks merit.
Appellant's second pro se assignment of error alleges:
 "THE TRIAL COURT ERRED IN FAILING TO ORDER A PSYCHIATRIC EXAMINATION TO DETERMINE THE DEFENDANT'S COMPETENCE TO STAND TRIAL. A PREPONDERANCE OF EVIDENCE PRESENTED TO THE COURT ESTABLISHED THE REQUIREMENTS FOR SUCH AN ORDER. FAILURE TO PROVIDE A COMPETENCY HEARING THEREBY DENIED THE DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL GUARANTEED BY THE UNITED STATES CONSTITUTION AMENDMENTS FIVE, SIX, AND FOURTEEN, AND ARTICLE 1, SECTIONS FIVE AND TEN OF THE OHIO CONSTITUTION. SUCH JUDICIAL ERROR SEVERELY PREJUDICED THE DEFENSE."
R.C. § 2945.37(A) provides that a competency hearing is mandatory when the court, prosecutor, or defense counsel raises the issue of the defendant's competency. In the absence of a motion for such a hearing, any right to a competency hearing is waived. State v. Bekesz (1991), 75 Ohio App.3d 436, 442 citingState v. Wilcox (1984), 16 Ohio App.3d 273, 275.
In the present case, the record reflects no motion for a competency hearing. Therefore, Appellant has waived any error with respect to his competency. This assignment of error lacks merit.
Appellant's third pro se assignment of error alleges:
 "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL. SUCH DENIAL PREJUDICED THE DEFENSE AND VIOLATED THE APPELLANT'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL GUARANTEED BY THE U.S. CONSTITUTION. THEREBY, THE TRIAL CANNOT BE RELIED UPON AS HAVING PRODUCED A JUST RESULT."
Appellant asserts that his trial counsel was ineffective in failing to request a competency hearing, failing to file a motion for change of venue or at least addressing the bias of the venire, failing to adequately investigate the facts of the case, failing to call necessary character and expert witnesses, failing to properly cross examine prosecution witnesses and failing to object to alleged prosecutorial misconduct.
A properly licensed attorney is presumed competent to conduct a criminal defense. State v. Hamblin (1988), 37 Ohio St.3d 153,155-56. The party raising the claim of ineffective assistance of counsel bears the burden of proving that trial counsel's performance fell below an objective standard of reasonableness and that prejudice arose from that performance. See generally,Strickland v. Washington (1984), 466 U.S. 668; State v. Smith
(1985), 17 Ohio St.3d 98, 100. Furthermore, a party claiming ineffective assistance of counsel must demonstrate that there is a reasonable probability that were it not for counsel's alleged error, the result of the trial would have been different.Strickland v. Washington, 695-696. We note also that trial counsel is given great latitude in matters of trial strategy.State v. Smith, 101.
In the present case, Appellant has not met the Strickland standard. With respect to Appellant's first claim that his trial counsel was ineffective in failing to request a competency hearing, the record does not indicate that the outcome of the trial would have been different had counsel made such a motion. Although Dr. Block testified that Appellant was susceptible to a medical condition which causes disorientation and confusion, he did not testify that Appellant was in such a state at any time during the proceedings.
With respect to Appellant's claim that his trial counsel should have moved for a change of venue or at least challenged the jury pool, an important consideration is whether pre-trial publicity prevented Appellant from having a fair trial and whether the juror's can lay aside the effect of any knowledge they have about the case. See, State v. Thompson (1987), 33 Ohio St.3d 1, 5. There is nothing on the record to indicate that there was any extensive pre-trial publicity. Furthermore, during voir dire, Appellant's trial counsel addressed the issue of prior knowledge of the case with each of the potential jurors and ascertained of all jurors seated that they could be fair and impartial and judge Appellant based on the evidence presented. See, id.
With respect to Appellant's claims that his trial counsel failed to adequately investigate the facts of his case, call necessary witness, properly cross examine prosecution witnesses, and to object to prosecutorial misconduct, Appellant has not demonstrated that had his trial counsel not committed the alleged errors that the outcome of his trial would have been different. Therefore, this assignment of error lacks merit.
For the foregoing reasons we hold that Appellant's assignments of error lack merit and affirm the jury verdict and judgment of the trial court.
Donofrio, J., concurs.
Vukovich, J., concurs.
APPROVED:
 ___________________________________ CHERYL L. WAITE, JUDGE