Raphael TRICE, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–1693.

District of Columbia Court of Appeals.

Argued June 1, 1995.

Decided July 24, 1995.

Martha J. Mullen for appellant.

Judson Lobdell, Asst. U.S. Atty., with whom Eric H. Holder Jr., U.S. Atty., and John R. Fisher and Thomas J. Tourish, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN and KING, Associate Judges, and BELSON, Senior Judge.

FERREN, Associate Judge:

Appellant Raphael Trice was charged with assault with intent to commit robbery while armed, D.C.Code §§ 22–501, –3202 (1989 Repl.), and possession of a firearm during a crime of violence, *id.* § 22–3204(b). Before trial, he moved to suppress his statement that "I gave it [the shotgun] back to the person I borrowed it from." The trial court denied the motion, and the jury convicted appellant on both counts. This case presents the question whether the "public safety" exception the Supreme Court announced in

*New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), provides a basis for the government to enter in evidence a shooting suspect's answer to a police detective's question about the location of a gun, even though the question was asked after the suspect had been informed of and asserted his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We hold that the "public safety" exception may apply after invocation of the right to silence and to counsel and, further, that on the particular facts of this case appellant's response was admissible under this exception. We therefore affirm appellant's convictions.[1]

### I.

The government's evidence at trial showed that Earl Green had been shot while walking near the rear of his residence at 1011 Fourth Street, S.E., just before 2:00 p.m., on Sunday, November 8, 1992. Green testified that appellant had approached him and demanded that Green "give it up"; then appellant shot Green with a shotgun and ran away. According to Green, a second suspect acted as a lookout during the attempted robbery and shooting. Green testified that he recognized both suspects from the neighborhood. Green called 911 within a few minutes after the shooting and identified appellant as the shooter. Green identified a photograph of appellant, and later identified appellant in court.

The only witness at the suppression hearing was Detective Neil Trugman of the Metropolitan Police Department. Detective Trugman testified that he had arrested appellant at his home, pursuant to an arrest warrant, on November 12, 1994, at approximately 5:30 p.m. While at the home, Detective Trugman also had seen appellant's mother and several small children. Appellant's

---

1. Appellant's other contentions have no merit. The prosecutor's statement in closing argument that the jury could consider appellant's interest in the outcome of the case when evaluating his credibility was not improper. *See McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991). There was no impropriety in the second challenged portion of the closing argument, where the prosecutor did not ask the jurors to put themselves in the place of the victim. Nor was appellant denied due process by the brevity of the jury's deliberations. *See United States v. Childress,* 746 F.Supp. 1122, 1138 (D.D.C.1990). Finally, the trial court did not abuse its discretion in refusing to sentence appellant under the Youth Rehabilitation Act, D.C.Code § 24–804 (1989 Repl.). *See Veney v. United States,* 658 A.2d 625 (D.C.1995).

mother had told Trugman that her son had an attorney. After placing appellant under arrest, Detective Trugman told him that he had the right to remain silent and that anything he chose to say could be used against him. Trugman then drove appellant to the police station and booked him. At the station, the detective gave appellant Metropolitan Police Department Form PD 47, which sets out the arrestee's *Miranda* rights.[2] Appellant and Detective Trugman read the rights card together. Then Trugman asked appellant, "Do you want to answer any questions?" Appellant replied "No." Trugman also asked appellant, "Are you willing to answer questions without having an attorney present," and appellant again answered "No." Appellant then signed the rights card.

For the next twenty minutes Detective Trugman asked appellant for personal background information, which appellant provided. Trugman then asked the following question: "I'd like to know where the shotgun is. There are little kids in the house. I don't want anyone to get hurt."[3] Appellant responded, "It's okay. I gave it back to the person I borrowed it from." Trugman did not ask any more questions.

At the conclusion of the hearing, the trial court found that appellant's statement was voluntary and denied his motion to suppress. The court ruled that the question about the location of the gun was "squarely within the public safety exception that the Supreme Court carved out" in *Quarles,* 467 U.S. at 655–59, 104 S.Ct. at 2631–33.

Appellant contends the trial court erred in denying the motion to suppress because (1) the public safety exception may not be applied to statements made after invocation of the rights to silence and counsel, and (2) even if the exception is available after a suspect has asserted these constitutional rights, it should not be applied in this case because the police detective had not been confronted by an imminent public danger when he asked appellant the question.

## II.

■ In *Miranda,* the Supreme Court announced a set of procedural requirements intended to help implement and protect the Fifth Amendment guarantee that "[n]o person ... shall be compelled in a criminal case to be a witness against himself." 384 U.S. at 467–479, 86 S.Ct. at 1624–1630. Under *Miranda,* before any custodial interrogation, the police must advise an individual that he or she has the right to remain silent and the right to have an attorney present. *See id.* at 479, 86 S.Ct. at 1630. In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court held that once a criminal suspect entitled to *Miranda* protection has asserted the right to counsel, that suspect

> is not subject to further interrogation by the authorities until counsel has been made

**2.** Metropolitan Police Department Form PD–47 states:

> You are under arrest. Before we ask you any questions, you must understand what your rights are. You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be provided for you. If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

**3.** There was some variation in Detective Trugman's testimony as to the precise language he used in asking this question. The first version of the question that he presented during direct ex-

amination at the suppression hearing was: "Listen. There were some small children in the house. Just for myself, and that no one else gets hurt, can you tell me where the shotgun is, if the shotgun is in the house?" The next version, on cross-examination, was: "I was at your house. There was a lot of young kids around the house. I hope the shotgun is out of the house because I don't want to see anybody else get hurt again." On redirect, Trugman testified that he had asked: "I'd like to know where the shotgun is because there's young kids in your house. I don't want to see anybody else get hurt." In its findings of fact, the court essentially credited this last version, finding that the detective had said: "I'd like to know where the shotgun is. There are little kids in the house. I don't want anyone to get hurt." Appellant has not contested the trial court's findings as to the precise language Detective Trugman used.

available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police. *Id.* at 484–485, 101 S.Ct. at 1885.

In the present case, it is undisputed that, before Detective Trugman asked appellant about the location of the gun,[4] appellant had said he would not answer questions without an attorney present. Thus, absent an applicable exception, *Edwards* would require the suppression of appellant's response to the question about the gun. *See United States v. Mobley,* 40. F.3d 688, 691 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2005, 131 L.Ed.2d 1005 (1995).

The government contends, and the trial court agreed, that the *Quarles* "public safety" exception authorized the government to introduce appellant's statement about the gun at trial, notwithstanding his prior assertion of *Miranda* rights.[5] In *Quarles,* the Supreme Court held that, when the police question a suspect before informing the suspect about *Miranda* rights, the answers may be admitted in evidence at trial if the officers' questions serve "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 n. 8. The Court reasoned:

Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's questions about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.

*Id.* at 657, 104 S.Ct. at 2632.

■ The exception the Supreme Court created in *Quarles* allows the admission in evidence of a suspect's reply to a question asked by a police officer *before* the suspect has received and responded to *Miranda* rights. In this case, therefore, we are called upon to decide, first, whether the public safety exception extends to statements made *after* a suspect has asserted the right to silence and to a lawyer and, second, whether the exception applies to the facts of this case.[6]

### III.

Neither the Supreme Court nor this court[7] has addressed *Quarles'* applicability to police

---

**4.** The government has not argued, nor do the facts suggest, that appellant had waived his right to counsel before answering Detective Trugman's question.

**5.** In *Quarles,* two police officers on road patrol were approached by a woman who told them that she had just been raped, described the rapist, and stated that he had entered a nearby supermarket and was carrying a gun. 467 U.S. at 651–652, 104 S.Ct. at 2628–2629. One of the officers entered the supermarket and saw a man fitting the description of the rapist. When that man saw the officer, he fled down one of the aisles. The officer pursued and caught the man after losing sight of him for a few seconds. When the man was frisked the police found only an empty holster. After handcuffing him, but before advising him of his rights, the officer asked where the gun was. The man indicated

some empty cartons and replied, "the gun is over there." *Id.* at 652, 104 S.Ct. at 2629. The Supreme Court, reversing three New York state courts, held that the statement and the gun were admissible under a new "public safety" exception to *Miranda. See id.* at 655–656, 104 S.Ct. at 2631.

**6.** The facts of the arrest and questioning of appellant are undisputed. We review de novo the trial court's legal conclusion that appellant's response to Detective Trugman's question is admissible under the public safety exception. *See Byrd v. United States,* 618 A.2d 596, 599 (D.C.1992).

**7.** The only case in this jurisdiction that addresses the public safety exception, *Edwards v. United States,* 619 A.2d 33 (D.C.1993) applied the exception to a statement the defendant made before receiving *Miranda* warnings.

questioning after an assertion of *Miranda* rights. Two federal circuit courts of appeals, however, have held that the public safety exception applies to statements made after invocation of the right to counsel. *See Mobley*, 40 F.3d at 693; *United States v. DeSantis*, 870 F.2d 536, 540–41 (9th Cir.1989).[8]

In *DeSantis*, two United States Marshals arrested the suspect in his apartment living room and informed him of his *Miranda* rights. DeSantis replied that he wanted to call his lawyer. 870 F.2d at 537. One of the marshals searched DeSantis while the other conducted a brief security sweep and determined that no one else was in the apartment. When the marshals told DeSantis that he would be going to court, DeSantis asked if he could change his clothes in the adjoining bedroom. One of the marshals then asked him if there were any weapons in the bedroom, and DeSantis replied that there was a gun on the shelf in the closet. The marshals found and seized a loaded .38 caliber revolver in an unzipped case on the closet shelf. *See id.*

The United States Court of Appeals for the Ninth Circuit concluded that even though DeSantis had asserted his right to counsel before responding to the marshal's weapon question, the gun was admissible in evidence under the public safety exception because the arresting officers had an objectively reasonable concern for their own safety, and thus the underlying rationale of the *Quarles* decision "would apply with equal force to the procedural safeguards established when the accused asks for the aid of counsel." *Id.* at 541. *The court reasoned:*

> The thrust of the *Quarles* decision is its recognition that certain exigencies require the courts to relax rules that act as prophylactic safeguards of the right against compelled self-incrimination. Thus, although *Miranda* warnings help ensure that the accused will make an informed waiver of his rights, this goal is overridden

when a threat to the public safety is posed. The stringent waiver standard established in *Edwards* ... also was designed as a prophylactic rule ... to prevent the police from effectively overriding a defendant's assertion of his *Miranda* rights by badgering him into waiving those rights....

> ❖ ❖ ❖ ❖ ❖ ❖

> The same considerations that allow the police to dispense with providing *Miranda* warnings in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further questioning of an accused who requests counsel.... Society's need to procure the information about the location of a dangerous weapon is as great after, as it was before, the request for counsel.

*Id.* at 540–41 (citations and internal quotations omitted).

■■■ We agree with the Ninth Circuit. The Supreme Court's reasoning in *Quarles* justifying a public safety exception to *Miranda* may be extended, logically, to an *Edwards*-type situation—in which the police initiate questioning after the suspect has invoked the right to counsel—for the straightforward reason that the danger does not abate with *Miranda* warnings and assertions. Very simply, there is no temporal relationship between the ongoing exigency and the timing of a *Miranda* refusal. We conclude, accordingly, that when a police officer asks a question after a suspect has asserted the right to counsel, the suspect's response will be admissible in evidence if, under the particular circumstances, the officer's question was attributable to an "objectively [9] reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 n. 8.[10]

## IV.

■■■ We therefore turn to the question whether appellant's response—"It's okay. I

---

8. *But see People v. Laliberte*, 246 Ill.App.3d 159, 186 Ill.Dec. 9, 17, 615 N.E.2d 813, 821 (1993).

9. Under *Quarles*, the detective's subjective motivation is not relevant to the applicability of the public safety exception. 467 U.S. at 656, 104 S.Ct. at 2631.

10. The public safety exception is limited to the admission of an otherwise suppressible statement taken in violation of *Miranda* and *Edwards*. This exception does not relieve the government of its burden to show the statement was voluntary. *See DeSantis*, 870 F.2d at 540.

gave it back to the person I borrowed it from"—to Detective Trugman's question about the shotgun was admissible under *Quarles'* "public safety" exception. We conclude, on this record, that the Detective's question was "reasonably prompted by a concern for the public safety," *id.* at 656, 104 S.Ct. at 2632, and that the trial court therefore did not err in denying appellant's motion to suppress.

Detective Trugman's belief that the gun used in the crime might be in appellant's home was supported by strong circumstantial evidence. The victim, Earl Green, had called 911 immediately after the shooting on November 8, 1992, and told the police that appellant had wounded him with a shotgun. The shooting took place in an alley behind 1011 4th Street, S.E., only one block away from appellant's residence at 212 K Street, S.E. Detective Trugman had no evidence suggesting that the shotgun had been taken somewhere other than to appellant's home after the shooting. Thus, the detective's belief that the shotgun might be in the home was an "objectively reasonable" one. *Id.* at 659 n. 8, 104 S.Ct. at 2633 n. 8.

When Detective Trugman went to appellant's home to arrest him on November 13, 1992, several days after the shooting, he saw several small children in the house.[11] Trugman's concern that there still might be a shotgun in the home posing a threat to small children was certainly reasonable and prompted by a concern for public safety. *See, e.g., Commonwealth v. Bowers*, 400 Pa.Super. 377, 583 A.2d 1165, 1171 (1990) (presence of children heightens danger created by hidden gun).

Appellant contends in his brief, however, that "[t]he exigent circumstances which justify a public safety exception as articulated in *Quarles* were totally absent" for two reasons: (1) four days had elapsed between the crime and appellant's arrest and questioning, and (2) Detective Trugman did not ask appellant about the location of the gun when he arrested appellant at his home, instead waiting more than an hour to do so when appellant was in Trugman's office at the police station. We cannot agree with this reasoning.

The fact that four days had passed before Detective Trugman asked appellant about the gun does not, in itself, make the public safety exception inapplicable. The passage of considerable time between the crime and police questioning about the location of a missing weapon might render the exception inapplicable if, for example, it would be unreasonable under the circumstances to believe, objectively, that the police questions were prompted by a concern for public safety, rather than by the need for factual investigation. In this case, however, the detective did not learn of the specific threat his question was designed to eliminate—danger to children—until he saw children in appellant's home at the time of arrest, four days after the shooting. On the facts here, therefore, the passage of four days between crime and questioning had no bearing on the later perception of danger and thus did not render the public safety exception inapplicable.

Similarly, the fact that Detective Trugman waited more than an hour after observing the children at appellant's home before asking appellant about the gun does not require us to conclude that his question was designed to elicit incriminating evidence rather than to protect the children. *Quarles* itself makes clear that application of the public safety exception is not limited to the moments immediately following the commission of a crime or the suspect's arrest:

> So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety....

467 U.S. at 657, 104 S.Ct. at 2632. This language suggests that there is at least a period of time following the suspect's arrest that an ongoing danger to the public will justify applying the public safety exception.

■ As indicated earlier, however, we do not suggest that the exception remains available indefinitely simply because a missing weapon has not been located; if the police, after becoming aware of a threat to public safety, delay questioning the suspect about

11. The record does not reflect the children's ages.

that threat for an unreasonable period of time, a court no longer may be able to conclude that the question was prompted by a concern for public safety rather than for factual investigation. This case, however, has not reached that outer limit.

The facts here are distinguishable, for example, from *Mobley*, where the United States Court of Appeals for the Fourth Circuit held that police questioning about the location of a weapon after the suspect had invoked his right to counsel did not satisfy the public safety exception. 40 F.3d at 693. In *Mobley*, eight FBI agents arrived at the apartment of a suspected drug dealer at 8:30 in the morning. After sweeping the apartment and finding no one else present, one of the agents informed Mobley that he was under arrest and read him his *Miranda* rights. *See id.* at 690. Mobley said that he understood his rights and wanted to speak to a lawyer. As one of the agents was leading Mobley out of the apartment, the agent asked "if there was anything in the apartment that could be of danger to the agents who would be staying to conduct the search warrant, such as a weapon." *Id.* at 691. Mobley replied that there was a weapon in the bedroom closet and then led the agents to it. *Id.*

The court held that Mobley's response was not admissible under the public safety exception because, at the time the agent asked Mobley about a weapon in the apartment, there no longer was "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id.* at 693 (quoting *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 n. 8). The court noted that at the time Mobley was asked the question, he was being led out of the apartment, the agents already had accomplished an initial security sweep, and they knew that no one else was in the apartment where Mobley lived by himself. The court concluded:

> There is nothing that separates these facts from those of an ordinary and routine arrest scenario. There was no explanation at any time as to what extraordinary circumstances prompted this question, and we must conclude that there were none.

*Id.* In the present case, however, the detective's observation of small children in appellant's home provided the "extraordinary circumstance[ ]" that justified the court's application of the public safety exception. This was not simply a routine arrest scenario.

■ The purpose of the *Quarles* exception is to prevent police officers from having to choose between protecting the public safety and preserving the admissibility of evidence. *See id.*, 467 U.S. at 657–58 & n. 7, 104 S.Ct. at 2632 & n. 7. A refusal to apply the exception in this case would effectively penalize the government because Detective Trugman asked a question reasonably prompted by a concern for the well-being of small children. We conclude, accordingly, that the trial court did not err in admitting in evidence appellant's response—"It's okay, I gave it back to the person I borrowed it from"—under the public safety exception.

*Affirmed.*