Thomas GREEN, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–1313.

District of Columbia Court of Appeals.

Argued June 19, 2008.
Decided June 25, 2009.

James Mangiafico, Washington, DC, with whom Mary Kennedy was on the brief, for appellant.

Anne Y. Park, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Elizabeth Trosman, B. Patrick Costello, Jr., and Suzanne G. Curt, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN and FISHER, Associate Judges.

REID, Associate Judge:

Appellant, Thomas Green, entered a conditional guilty plea to drug and weapons violations; he reserved the right to appeal the trial court's denial of his motion to suppress evidence. He claims that the trial court violated his Fourth and Fifth Amendment rights by failing to grant his suppression motion. We conclude that on this record, the police had reasonable articulable suspicion to stop Mr. Green and the trial court did not err in declining to grant Mr. Green's suppression motion on Fourth Amendment grounds. We also hold that the public safety exception to the *Miranda*[1] rules applies to this case; that Mr. Green's statement as to the location of the gun was not coerced; and that the trial court did not violate Mr. Green's Fifth Amendment rights in denying his motion to suppress. Consequently, we affirm the trial court's judgment of conviction, but at the parties' request, we remand this case for re-sentencing.

## FACTUAL SUMMARY

The record reveals that on March 8, 2006, around 4:45 p.m., Metropolitan Police Department ("MPD") Officer Savyon Weinfeld and his partner, Officer Gaumond,[2] were on patrol in a known high drug area in the Northeast quadrant of the District of Columbia, when they received a radio run directing them to proceed to specified premises in the 1400 block of G Street where "a tall, dark[-]skinned black male wearing a white and black t-shirt with a snowman printed on the front and blue jeans, was standing next to a blue van...." The man reportedly had a gun. Officer Weinfeld, a six-year veteran of MPD with over one hundred narcotics-related arrests and twenty to thirty gun arrests, testified that upon arrival at the designated address, he saw "a blue conversion van that had the doors opened...." A man, later identified as Mr. Green, got out of the vehicle while the officers were still in their car. He was about five feet, eleven inches tall, black and dark-skinned. He had on "a black long-sleeved t-shirt" and, over it, a white t-shirt bearing a picture of what Officer Weinfeld thought was a snowman, but which turned out to be "a large cartoon print of the Pillsbury Doughboy on it." When Mr. Green saw the police vehicle, "he got wide-eyed" and "he made an overt motion to his waist[,] ... plac[ing] his hand directly to his waist."[3]

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Officer Gaumond's last name also appears in the record as "Gauman."

3. Officer Weinfeld explained:
   Generally, when persons carry guns, especially concealed, ... typically—I do it myself when I'm on my own time on off-duty when I conceal the firearm—[they] will check to insure that it's still there.... [T]hey teach us [in training] an overt motion. If I go out and somebody bumps into me, I'll put my hand back to make sure [the firearm] wasn't moved or dislodged.
   And it's very common for criminals [who] carry firearms to do the same, and it typically

The officer noticed that Mr. Green "began to reenter the side doors of the conversion van[,]" and "[a]t that time, [he] and Officer Gaumond had exited [their] vehicle and began to approach [Mr. Green]."[4] The officers had their guns drawn, but they were pointing "down at an angle."[5] Because of the radio dispatch and his training, Officer Weinfeld "had no doubt that [Mr. Green] was armed." Hence, "[a]fter seeing the defendant's motion," he "immediately drew [his] weapon" after leaving his vehicle.

Mr. Green had re-entered his van; a female passenger was in the front passenger seat. Officer Weinfeld "observed . . . another individual . . . walking down the steps of [a residence in the 1400 block of] G Street toward [the officers], as [they] went to stop Mr. Green." Officer Gaumond instructed Mr. Green to leave the van, and then he "placed him on the ground." At the same time, Officer Weinfeld "stopped [the man who was leaving the premises on G Street] for safety purposes and had him placed on the ground as well." The female passenger in the van was ordered to exit the vehicle and to get on the ground. The officers posed no questions, but as Officer Gaumond was securing Mr. Green for safety reasons, Mr. Green said, "I've got a gun in my waist, chief."[6] When Officer Gaumond "patted down" Mr. Green, he found a ".9 millimeter Smith and Wesson handgun . . . in his waistband." Mr. Green was arrested; and when Officer Gaumond searched Mr. Green's person, he "yelled" to Officer Weinfeld that he had found "crack." Officer Gaumond had recovered fifty-five Ziploc rocks of cocaine and one Ziploc of marijuana from Mr. Green's pocket. The female passenger also was placed under arrest because she had an open container of alcohol. In addition to the testimony of Officer Weinfeld, the government presented the testimony of MPD Detective Michael Anthony Wiggins who interviewed Mr. Green on the day of his arrest. He videotaped a statement by Mr. Green and the videotape was introduced into evidence.

Kevin Price, Mr. Green's friend, who was with him during the incident that led to Mr. Green's arrest, testified for the defense, as did Mr. Green. Mr. Price, the husband of the woman in the front passen-

---

occurs when they believe that somebody is taking notice of their firearm.

4.  On cross-examination, Officer Weinfeld was asked about the sequence of events. He indicated that he was in the police car when he first saw Mr. Green, and that "[o]nce [the officers] saw Mr. Green step out of the vehicle, [they] exited [the police car.]." When asked "how much time elapsed from the time [he] exited [his] vehicle to when [he] first drew [his] gun," Officer Weinfeld said, "[A]fter seeing the defendant's motion, I exited the vehicle and immediately drew my weapon."

5.  In response to a cross-examination question concerning the position of his gun at the time, Officer Weinfeld demonstrated and declared: "I held the barrel of the gun at an angle downward, so if there was an accidental discharge you wouldn't be pointing at anybody."

The trial judge described the demonstration: "And the witness, for the record, has extended his thumb and forefinger in the shape of a gun and that he's done with his right hand and he has cupped that hand in his left hand all held up right between the pockets of his shirt with the forefinger pointed at an angle toward, I would say, his shoe."

6.  A little later in his direct examination testimony, Officer Weinfeld recounted what Officer Gaumond had told him as he placed Mr. Green on the ground:

When he placed the defendant on the ground, he [Officer Gaumond] stated, "he's got a gun . . ., and then the defendant made the statement, . . . "I've got a gun in my waist, chief."

Officer Gaumond had not yet searched Mr. Green when he told Officer Weinfeld that Mr. Green had a gun.

ger seat of the van, stated that he was standing outside with Mr. Green while his wife was backing the van up. As Mr. Price, his wife and Mr. Green stood talking, he "saw a police car speeding down the street" and thought it "was about to hit the van." A police officer exited the police car with his hand on his gun and repeatedly said: "Get the f* *k down on the ground.... Where['s] the gun?" The officer "slammed [Mr. Price and him] on the ground and had his foot ... in [Mr. Green's] back and had the gun pointed at [him]." When defense counsel asked when the officer drew his weapon, Mr. Price answered: "When we [were] getting out of the car, he was drawing his weapon." And, when defense counsel inquired, "where was the gun pointed[,]" Mr. Price replied: "At me and Thomas." Other police officers arrived and Mr. Price and Mr. Green were handcuffed. While he was on the ground, and after hearing the question repeatedly, "where['s] the gun[,]" Mr. Green declared: "the gun['s] right here. The gun['s] right here. Here you go. That's what you wanted. Right here."

On cross-examination, Mr. Price asserted that only one officer arrived in the police car, and when the police pointed the gun in his direction, he was not watching the officer and Mr. Green, and that his "eyes [were] on both of them, for real." He maintained that when the officer pointed the gun at Mr. Green, "[h]is hands [were] ... up in the air." He never saw Mr. Green put his hand to his waist.

Mr. Green testified that before the incident leading to his arrest, he was talking with Mr. Price outside the van, and Mr. Price's wife was in the van. He had on "a light t-shirt, blue jeans, ... [and] a long John shirt under the white shirt." When Mr. Price called his attention to the police, he "turned around and [he saw] the police with their guns drawn[,]" and pointed at

both men. The police "force[d]" both men to the ground, "put ... handcuffs on [them], then they kept asking where's the gun." Officer Gaumond posed the question, with his knee on Mr. Green's back, "[a]bout three or four times." Mr. Green responded, "I got the gun." Officer Gaumond removed it from Mr. Green's waist, stood him upright, searched him, and found cocaine in his pocket. He never tried to flee and never tried to check his waist to see if the gun could be seen. On cross-examination Mr. Green acknowledged that he planned to sell the gun, but insisted that he had not planned to sell drugs that day, and he admitted that Officer Gaumond found fifty-five Ziplocs of crack cocaine and one Ziploc of marijuana in his pocket.

The trial judge asked Mr. Green questions about what had happened before the police removed the gun from his waist. Mr. Green said he did not respond when Officer Gaumond asked, who's got the gun. When Mr. Price's wife began to ask the police, "what was going on," she was told to "get down, too[,]" but she inquired, "why do I have to get down [,]" and another officer "told her to get on the ground before he knocked her out." At that point, after Mr. Price's wife was on the ground, Mr. Green "just told the officer I got the gun."

At the conclusion of the evidentiary phase of the suppression motion hearing, the trial court conducted a colloquoy with counsel and heard argument concerning the factual and legal issues pertaining to the motion. On June 9, 2006, the trial court denied Mr. Green's motion to suppress. Based on the testimony presented and the testimony the trial judge credited, the judge found that "[t]here is no indication of the source of the information contained in the [police computer or radio] dispatch" for a person "standing next to a

blue van in front of [specified premises on] G Street, Northeast . . . [with] a gun in his waistband." Nevertheless, when the officers "pulled up" at the designated address, "they saw [Mr. Green] just coming out of the van which was parked at the curb with all passenger side doors open." He matched the description given, including the picture on the t-shirt which Officer Weinfeld "immediately believed [ ] was a picture of a snowman[,]" but in fact was "a white puffy cartoon figure." Mr. Green noticed the police car "and bec[a]me wide-eyed." Mr. Green made a gesture to his waist. Officer Weinfeld recognized the gesture as one made "by suspects on the street" for the purpose "of checking one's gun in a waistband to make sure that it remains as it was previously positioned there." The court further determined that "[a]t that point, [Mr. Green] began to retreat into the van[,]" and "[a]t that time, Officer Weinfeld had . . . 'no doubt that [Mr. Green] was armed.'"

The officers exited their marked vehicle, "drew their guns immediately as they got out of the car for their safety," but held the guns "pointed at an angle down towards the sidewalk or down towards their feet . . . [,] all for safety reasons." As the officers approached the van, "[o]ne or both of them yelled three or four times at this point, where is the gun, where is the gun." [7] And, "[a]s [Mr. Green] was entering the van at the approach of the police," Mr. Price arrived on the scene from the premises and his wife was inside the van. Officer Gaumond physically removed Mr. Green from the van after he had reentered

it, and Officer Weinfeld ordered both Mr. Green and Mr. Price "to get down on the ground face down." Both officers had "reholstered their guns at this point." Officer Gaumond "did not cuff [Mr. Green] immediately. He asked the defendant where is the gun. The defendant did not respond." About a minute elapsed before any more conversation occurred between Mr. Green and Officer Gaumond. During that time, Officer Gaumond's "attention was drawn to Officer Weinfeld's interaction with [Mr. Price's wife.]" Then, Mr. Green "stated here's the gun or here is the gun, chief." [8] He "gestured to his waist to indicate a .9 millimeter Smith and Wesson firearm that was tucked into his waistband." Officer Gaumond "removed the weapon, [and] announced he has got a gun to his partner." Around that time other officers arrived on the scene. Officer Gaumond handcuffed Mr. Green, "stood [him] up, searched him and found in a pocket on [him] 55 bags of suspected crack and one bag of marijuana in his pocket." He then informed Officer Weinfeld that Mr. Green "had crack in his pocket."

The trial court generally credited the testimony of Officers Weinfeld and Detective Wiggins. [9] The court determined that the testimony of Mr. Green and Mr. Price "corroborated in material detail" that of Officer Weinfeld, with one exception— "whether [Mr. Green] made a gesture to his waistband and retreated into the van after the arrival of the officers and the timing of the handcuffs." With respect to that exception, the trial court "specifically f[ou]nd that the gesture to the waistband

**7.** The trial court obviously credited the testimony of Mr. Price and Mr. Green that the police officers asked, "where is the gun," rather than Officer Weinfeld's testimony that Mr. Green's statement about the presence of the gun was not made in response to a question from the officers.

**8.** The record shows that Officer Gaumond's nickname in the area was "Master Chief."

**9.** The parties stipulated to most of the testimony of Detective Wiggins relating to his administration of *Miranda* warnings and his interview with Mr. Green at the police station.

was made and that [Mr. Green] retreated into the van."

The trial court did not "reach the question whether the circumstances [the police officers] observed before they got out of the car were enough for probable cause." Rather the court found that these circumstances "were sufficient to establish reasonable suspicion." That is, the anonymous tip, which "was corroborated in all innocent detail," together with "furtive gesture or a gesture of concealment" to his waistband, and Mr. Green's retreat to the van, "were sufficient to establish reasonable suspicion." The trial court declared, in part:

The question what a reasonable police officer should do in the circumstances arises here. And given that a van is an automobile and that [Mr. Green] after touching his waistband or gesturing to his waistband actually began to retreat into the van, would have left the officers in a position of permitting departure from the scene if they had done nothing after observing suspicious conduct and receiving an extremely detailed and corroborated description.

And while, of course, without reasonable suspicion, they would have to let the defendant simply depart the scene. The fact that [Mr. Green] did appear to be retreating in response to [the officers'] presence after a furtive gesture, in my view, made their response reasonable and with reasonable suspicion.... I find that the police had reasonable suspicion to approach [Mr. Green] and investigate further.

With respect to events after the initial observations of the officers that the trial court found formed the basis for reasonable suspicion, the court concluded that the officers appropriately pulled out their weapons, but that Mr. Green was not under arrest at the time he made the statement that he had a gun in his waistband. As the trial court stated:

[B]ased on the conduct of [Mr. Green], the approach of other individuals, the interaction with the woman [Mr. Price's wife] inside the car, ... for safety reasons, it was appropriate for [the police officers] to pull their weapons, to hold them in the manner that they did hold them. And once the number of people on the scene became sufficiently of safety concern, and ... once [the officers] developed a good deal of certainty that [Mr. Green] was armed, ... it was appropriate to put the individuals on the scene down on the ground for everyone's safety.

I find that this did not convert the interactions to a full-blown arrest.... [T]hese actions were consistent with our cases within the scope of an appropriate *Terry* stop and the circumstances for the safety of the police and of the other individuals present.

I could add that [Mr. Green] would have had no reasonable basis to believe he was under arrest at the time the police put him down on the ground. [The police officers] were clearly looking for a firearm. [Mr. Green] had not disclosed the presence of the firearm and he knew that they had no basis on which to arrest.

And so I do find that at the time [Mr. Green] made the statement that the gun was in his waistband that he was not under arrest for Fourth Amendment purposes and that, therefore, that statement was not the fruit of a Fourth Amendment violation.

The trial court determined that the police did not violate Mr. Green's Fifth Amendment constitutional right, either because of a *Miranda* violation, or because he made an involuntary statement. Mr. Green "was asked a question, [but he]

didn't answer the question. And then sometime later after observing a lot of chaos and interaction with [Mr. Price's wife] in the car, said, here is my gun." When he made that statement, Mr. Green "was not responding to a question at the time." Moreover, even assuming that he was answering a question, the trial court concluded that *Miranda's* "public safety exception" applied and that, essentially, the question, where is the gun, was proper without giving the *Miranda* warnings, and Mr. Green's statement about the gun did not violate *Miranda.* Under this analysis, the trial court did not reach the question of whether Mr. Green was "in custody for Fifth Amendment purposes...." Furthermore, said the trial court, "[e]ven if [the question] were a *Miranda* violation, the answer ... could be used to formulate probable cause.... Once [Mr. Green] said here is my gun, the police had probable cause to arrest." Therefore, "[a]ny search after that was a valid search incident to arrest[,]" and "the recovery of the crack ... was incident to arrest."

## ANALYSIS

### The Fourth Amendment Issue

■ Mr. Green seeks reversal of the trial court's denial of his motion to suppress tangible evidence and his statements. He contends that the trial court's finding "that Mr. Green had attempted to flee before the police seized him ... was clearly erroneous, and the facts that did occur before Mr. Green's seizure are insufficient to establish reasonable suspicion." Specifically, he argues, the anonymous tip

and his gesture to his waistband were insufficient to support a finding of reasonable suspicion. Rather, he maintains that this court should require "that an anonymous tip be corroborated by behavior that is unlikely to have occurred for innocent reasons."

■ "In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." [10] "In particular, [this court] must give deference to the trial court's findings of fact as to the circumstances surrounding the appellant's encounter with the police and uphold them unless they are clearly erroneous." [11] "However, we review *de novo* the trial court's legal conclusions and make our own independent determination of whether there was either probable cause to arrest or reasonable suspicion justifying a *Terry* stop." [12] "Essentially, our role is to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." [13]

■ Generally, "[t]he Fourth Amendment's prohibition on unreasonable seizures protects persons from being detained by the police without adequate justification." [14] "Although whether there has been a 'seizure'— determined by reference to whether a reasonable person would have believed he was not free to leave, is a necessary predicate for application of the Fourth Amendment, the ultimate inquiry undertaken in analyzing such a de-

10. *Shelton v. United States,* 929 A.2d 420, 423 (D.C.2007) (citations and internal quotation marks omitted).

11. *Id.* (citation and internal quotation marks omitted).

12. *Prince v. United States,* 825 A.2d 928, 931 (D.C.2003) (citations and internal quotation marks omitted).

13. *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991) (citation omitted).

14. *In re I.J.,* 906 A.2d 249, 258 (D.C.2006).

tention for compliance with the Fourth Amendment is whether the officer's actions are objectively reasonable." [15] "Thus, the Fourth Amendment permits a range of police action measuring the reasonableness of the infringement on personal liberty—mere seizure or arrest—against the quality of the information giving rise to the police intervention—reasonable articulable suspicion or probable cause." [16] Consequently, "[t]he police may conduct an investigatory stop on less than probable cause provided that, under the totality of the circumstances, the police officer could reasonably believe that criminal activity was afoot." [17] In determining whether the police had reasonable suspicion, we allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." [18]

Here, our review of the record satisfies us that in light of the trial judge's credibility determinations, and viewing the record in favor of sustaining the trial court's ruling,[19] the court's factual findings are not clearly erroneous. Moreover, we see no reason to disturb the trial court's conclusions regarding the alleged Fourth Amendment violation.

The trial court found reasonable articulable suspicion based on (1) the anonymous telephone tip "corroborated in all innocent detail (blue van, tall Black, dark[-]skinned man wearing a t-shirt with a picture of what appeared to be a snowman)"; (2) the "furtive gesture or a gesture of concealment" by Mr. Green to his waistband (where those engaged in criminal activity are known to hide a gun); and (3) Mr. Green's "wide-eyed" retreat to the van when he noticed the police. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" [20]

Nevertheless, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" [21] That is the case here and we agree with the trial court that the officers' corroboration of the tip with respect to the physical and clothing description given by the tipster, Officer Weinfield's interpretation (based on his training and experience) of Mr. Green's motion to his waist or furtive gesture of concealment, and Mr. Green's retreat into the van upon seeing the police all pointed to a reasonable investigatory stop of Mr. Green. Furthermore, the trial court cred-

15. *Id.* (referencing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (other citation and internal quotation marks omitted).

16. *In re I.J., supra* note 14, 906 A.2d at 258–59.

17. *Jackson v. United States,* 805 A.2d 979, 983 (D.C.2002) (citations and internal quotation marks omitted).

18. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks and citation omitted).

19. *Shelton, supra* note 10, 929 A.2d at 423.

20. *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (quoting *Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)) (internal citation omitted).

21. *J.L., supra* note 20, 529 U.S. at 270, 120 S.Ct. 1375 (quoting *White, supra* note 20, 496 U.S. at 327, 110 S.Ct. 2412).

ited the testimony of Officer Weinfeld showing that the police did not seize Mr. Green until their observations gave them reasonable, articulable suspicion that he was indeed the man who was the subject of the anonymous telephone call. "[P]ersonal observations made by the officers that corroborate information furnished by an unknown and unaccountable tipster may provide the basis for a reasonableness finding." [22]

In short, we conclude that on this record, the police had reasonable articulable suspicion to stop Mr. Green and the trial court did not err in declining to grant Mr. Green's suppression motion on Fourth Amendment grounds.[23]

### The Fifth Amendment Issue

Mr. Green asserts that his statement, "Here's the gun," was involuntary, "a product of the coercive situation created by the display of extreme police force," and the trial court erred by not excluding it on Fifth Amendment grounds. In addition, he claims his statement "was made in response to police interrogation before [he] had been advised of his right against incrimination." The government contends that Mr. Green waived his Fifth Amendment claim "by failing to raise it at the hearing and failing to secure a ruling on it." In addition, the government contends that Mr. Green waived certain factors relating to the alleged involuntariness of his statement because they were not raised in the trial court-specifically, "the threat of the police to [Mr.] Price's wife, [Mr.

Green's] age, and concerns about [Mr. Green's] mental health." In his reply brief Mr. Green points out that the trial court not only considered his Fifth Amendment argument, but also ruled on it.

The transcript of the motions hearing confirms that following her consideration of Mr. Green's Fourth Amendment claim, the trial judge turned to the arguments of government and defense counsel concerning an alleged Fifth Amendment violation. The trial court determined, in part, that Mr. Green was asked a question but did not respond, but later said "here is my gun," but not in response to any question, and even if he responded to the question, his response would not constitute a Fifth Amendment violation:

> With respect to the Fifth Amendment claim that [Mr. Green's] statement was taken as [either] a *Miranda* violation or was involuntary, the defendant was asked a question, didn't answer the question. And then sometime later after observing a lot of chaos and interaction with [the female passenger] in the car, said, here is my gun.
>
> I find that, in fact, he was not responding to a question at the time. And even if he were, ... there is a public safety exception to *Miranda*. That the question of where is the gun [is] specifically permitted even if the defendant were in custody for Fifth Amendment purposes, the question I don't reach at this stage because I don't believe I have to, and under *Quarles* out of the Su-

---

**22.** *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir.2006) (police officers had reasonable suspicion to seize defendant based upon an anonymous tip because of "detailed description by the anonymous tipster, the rapid identification [of the person described by the tipster], ... the location of [the defendant] in a high crime area, ... [and] the officers' personal observations ... [,]" including the defendant's "evasive conduct.").

**23.** Although the officers drew their guns before seizing Mr. Green, we agree with the trial court that at that point he was not under arrest. The trial judge specifically found, and that finding is not clearly erroneous, that the guns were pointed downward at an angle and not directly at Mr. Green's body.

preme Court, . . . the defendant's answer to an unwarned question, even if I found that it were an unwarned question, where is the gun, is not a *Miranda* violation.

In *Dickerson v. United States*, the Supreme Court emphasized that *Miranda* is a "constitutional decision," and the Court reaffirmed *Miranda's* requirement that "certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted into evidence." [24] While *Miranda* and *Dickerson* recognized the constitutional importance of the individual right against self-incrimination, *New York v. Quarles* identified a "narrow exception to the *Miranda* rule"—"the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." [25] Consequently, *Quarles* "held that such statements need not be suppressed when the questioning concerns a threat to public safety." [26] The public safety exception " 'does not depend on the motivation of the individual [police] officers involved' "; the governing standard is articulated as " 'an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.' " [27]

We conclude that the narrow public safety exception to the *Miranda* rule applies in this case. The factual context for our analysis follows. As the police officers arrived in a known high drug area to investigate a tip that a man (described in detail) had a gun by a blue van, events moved quickly as they saw the described man make a furtive gesture to his waist (confirming for Officer Weinfeld the presence of a gun), and as they noticed a passenger in the van and another person approaching them from the steps of a residence. Both Officers Weinfeld and Gaumond believed there was danger at least to themselves. Hence, they decided to secure Mr. Green "for safety purposes" or safety reasons.

24. 530 U.S. 428, 431–32, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *see also Graham v. United States*, 950 A.2d 717, 730 (D.C.2008) ("Police questioning of a suspect . . . in any police facility . . . raises significant concerns for which *Miranda* warnings are an appropriate prophylactic against compelled self-incrimination.") (footnote omitted); *In re I.J.*, *supra* note 14, 906 A.2d at 259 ("The Fifth Amendment . . . shields a person who has been identified as a suspect from compelled self-incrimination . . . .") (citation omitted); *Dyson v. United States*, 815 A.2d 363, 366 (D.C.2003) (*Miranda* requires that "once a suspect is in custody, any statement made to police in response to custodial interrogation must be suppressed unless the appropriate warnings have been given.") (citation omitted); *Resper v. United States*, 793 A.2d 450, 455–56 (D.C. 2002).

25. 467 U.S. 649, 657–58, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

26. *Dyson*, *supra* note 24, 815 A.2d at 366. In *Quarles*, *supra* note 25, police officers responded to an in-person tip that a man who had entered a supermarket had a gun. One of the officers entered the supermarket, saw a man who fit the description given by the tipster and pursued him as the man ran to the back of the store. When he found only an empty shoulder holster, without giving *Miranda* warnings the officer asked where the gun was. *Quarles*, *supra* note 24, 467 U.S. at 651–52, 104 S.Ct. 2626.

27. *Dyson*, *supra* note 24, 815 A.2d at 366 (quoting *Quarles*, *supra* note 25, 467 U.S. at 656, 659 n. 8, 104 S.Ct. 2626); *see also United States v. Newton*, 369 F.3d 659, 677–78 (2d Cir.2004) ("The public safety exception to *Miranda* does not depend upon the subjective motivation of the questioning officer[;] [r]ather, it applies so long as the questioning relates to an objectively reasonable need to protect the police or the public from any immediate danger.").

In *Dyson, supra* note 24, we applied the narrow public safety exception to the *Miranda* rule, holding that the police officer there "had an objectively reasonable basis for suspecting that [appellant] was carrying a gun and that the suspected presence of a gun hidden in an alley created a legitimate threat to public safety."[28] There was no tip in that case about the presence of a firearm, nor details about the person who allegedly had the gun, as in this case. Instead, officers on patrol observed a person "suspiciously ducking his head behind a car." When an officer told him to stop, he "dropped a crumpled-up paper bag ... and then started to run." As he ran, one officer noticed the man "tugging at his waistband" and "thought he 'saw the butt of a handle of a gun.'" After sealing off an alley, the officers apprehended the man, but found no gun on his person. Upon retrieving the bag dropped by the man and discovering that it contained six Ziplock bags of marijuana, and without giving the *Miranda* warnings, one officer asked the man "where the gun was" and indicated they "need[ed] to find it, so no little kids get it and hurt themselves." The man replied: " 'That was my weed, but I don't have a gun.' "[29] We concluded that the trial court properly denied appellant's motion to suppress because the police officer in *Dyson* "saw behavior that reasonably led him to believe [appellant] was carrying a gun," and because "there was a legitimate public safety concern" based on the suspicion that a gun was located in an alley, which was akin to a legitimate public safety concern in *Edwards v. United States*,[30] about a gun in an apartment building open to the public.[31]

28. *Dyson, supra* note 24, 815 A.2d at 369.

29. *Id.* at 365.

30. 619 A.2d 33 (D.C.1993).

31. *Dyson, supra* note 24, 815 A.2d at 368–69 (discussing *Edwards* ). In *Edwards*, we said that "the trial judge could reasonably conclude [under *Quarles* ] that the police questions, 'where's the gun?' and 'where's the rifle' were 'reasonably prompted by a concern for public safety,' and were necessitated by the presence on the premises of a missing rifle.'" 619 A.2d at 36 (citations omitted). In addition to *Edwards*, *Dyson* also discussed two other cases in which this court considered the public safety exception to the *Miranda* rule. In *Crook v. United States*, 771 A.2d 355 (D.C.2001), police officers confronted a situation in which appellant held a gun and was wounded, and another man on the scene was bleeding. "[R]ealizing that other armed individuals might be in the vicinity, [an] officer asked several questions about the cause of the wounds[,]" without giving *Miranda* warnings. *Id.* at 356. We concluded that the police officer's questions to appellant "[fell] within the 'public safety' exceptions to the requirement for *Miranda* warnings, since they were directed at dealing with the danger created by the possible presence of other armed and dangerous individuals in the immediate vicinity." *Id.* at 358 (footnote omitted). The other case mentioned in *Dyson* presented a different scenario and issue. *Trice v. United States*, 662 A.2d 891 (D.C. 1995), focused on "whether the public safety exception extends to statements made *after* a suspect has asserted the right to silence and to a lawyer and, second, whether the exception applie[d] to the facts of [that] case." *Id.* at 894 (footnote omitted). Appellant had been arrested at his home but was taken to the police station where he invoked his *Miranda* rights. Nevertheless, a police officer posed a question along the following lines: "I'd like to know where the shotgun is. There are little kids in the house. I don't want anyone to get hurt." *Id.* at 893 (footnote omitted). We said that "when a police officer asks a question after a suspect has asserted the right to counsel, the suspect's response will be admissible in evidence if, under the particular circumstances, the officer's question was attributable to an 'objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" *Id.* at 895 (quoting *Quarles, supra* note 25, 467 U.S. at 659 n. 8, 104 S.Ct. 2626) (footnote omitted). Applying that legal principle to the facts of *Trice, supra*, we "conclude[d] ... that the Detective's ques-

Other jurisdictions have addressed the application of the public safety exception to the *Miranda* rules, but we believe the analytical framework adopted by the Second Circuit is helpful. That framework involves three principles "distill[ed]" from their past cases; [32]

> First, ... *"Miranda* warnings need not precede 'questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers," "so long as the questioning 'relate[s] to an *objectively* reasonable need to protect the police or the public from any immediate danger' ".... Second, the exception is limited by the fact that pre-*Miranda* questions, while "framed spontaneously in dangerous situations," may not be investigatory in nature or "designed solely to elicit testimonial evidence from a suspect".... Third, we [do] not condone[ ] the pre-*Miranda* questioning of suspects as a routine matter. Rather, recognizing the need for "flexibility in situations where the safety of the public and the officers are at risk," ... the public safety exception [is] " 'a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case.' " [33]

In the instant case, the police officers' question, "where is the gun[,]" is traceable to an objectively reasonable concern for safety. Officer Weinfeld approached Mr. Green, who matched the tipster's description, after he saw him make an "overt motion to his waist ... plac[ing] his hand directly to his waist," a motion which the officer's training associated with the presence of a firearm and which left him with "no doubt that [Mr. Green] was armed." Officer Weinfeld testified that Officer Gaumond secured Mr. Green for safety reasons, and he "stopped [Mr. Price] for safety purposes." [34] The officers, who were responding to a tip that a man (described in detail) had a gun, had to consider possible danger from not just one person in a high drug area where drugs and guns are associated, but from three persons, another of whom was approaching them from the steps of a nearby residence, and the third of whom was seated in the van. Notably, the only question posed by the officers was, "where is the gun?" The trial court found that as the officers approached the van, "[o]ne or both of them yelled three or four times at this point, where is the gun, where is the gun?" Even Mr. Price and Mr. Green in their respective trial testimony only mentioned one question posed by the police—"where's the gun?" Rather than phrasing questions "designed solely to elicit testimonial evi-

tion was 'reasonably prompted by a concern for the public safety,' and that the trial court therefore did not err in denying appellant's motion to suppress." *Id.* at 896 (internal quotation marks and citations omitted).

**32.** *United States v. Estrada,* 430 F.3d 606, 612 (2d Cir.2005).

**33.** *Id.* (citing *United States v. Reyes,* 353 F.3d 148, 152, 155 (2d Cir.2003); *United States v. Newton,* 369 F.3d 659, 677, 678 (2d Cir.2004); *Quarles, supra* note 25, 467 U.S. at 656, 658–59, 104 S.Ct. 2626) (other citations omitted).

**34.** Officer Weinfeld did not specify whether the use of the word "safety" or the phrase "safety purposes" referred to the safety of the officers, or public safety of others stemming from the suspected presence of a gun on a person located in the public street of a residential neighborhood. Either inference or both are reasonable on the facts of this case. Officer Weinfeld identified a picture of the crime scene taken on the day of the incident. He stated that "one male on the porch" of a house near the van (presumably Mr. Price) was present at the time of the incident "but there's several people that come out of the house as onlookers."

dence from a suspect[,]" we think the officers' single question related to the objectively reasonable need to protect the police or the public from immediate danger.[35]

Consequently, given the facts and record in this case, we hold that the public safety exception to the prophylactic *Miranda* rule applied, and Officers Weinfeld and Gaumond had an objectively reasonable need to protect at least themselves from a legitimate and immediate danger since they reasonably suspected that Mr. Green had a gun, and they reasonably asked, spontaneously, "where is the gun?"

■■■ But Mr. Green also asserts that his statement revealing the presence of a gun on his person was involuntary. He claims (1) he made the statement in response to (a) "a tense, rapidly unfolding situation, with pervasive police presence" and "weapons pointed[at him," and (b) a police order to the female passenger in the van to "get on the ground" and an officer's threat to "knock her out"; (2) he was susceptible to coercion because of his age—21–years–old; and (3) "there have been questions about [his] mental health, which prompted a pretrial services representative to declare him in need of mental health services and the trial court to order a psychiatric evaluation."

■■■ "The Fifth Amendment itself does not prohibit all incriminating admissions; '[absent] some officially *coerced* self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.' "[36] "The test for determining the voluntariness of specific statements is 'whether under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion.' "[37] The government has the burden of proof on the issue of voluntariness.[38] While our review of the legal question is *de novo,* "we defer to [the court's] findings of evidentiary fact"; that is, "[w]e review findings of historical fact only for clear error, and give due weight to [reasonable] inferences drawn from those facts...."[39]

The record supports the trial court's findings that Mr. Green was not under formal arrest nor in handcuffs at the time he made the statement, and no guns were pointed at him. Unlike the case on which Mr. Green principally relies, only two police officers were on the scene, rather than fifteen to twenty, there were no police helicopters hovering above, and Mr. Green was on a public street in a residential neighborhood.[40] Moreover, the record does not show that the trial court made a factual finding that Officer Gaumond threatened to "knock out" the female passenger. Rather the trial court found that "sometime later after observing a lot of chaos and interaction with [the female pas-

---

**35.** *Estrada, supra* note 32, 430 F.3d at 612 (citations and internal quotation marks omitted).

**36.** *Quarles, supra* note 25, 467 U.S. at 654, 104 S.Ct. 2626 (citation omitted) (emphasis in original); *see also Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (footnote omitted) ("there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary").

**37.** *United States v. Turner,* 761 A.2d 845, 854 (D.C.2000) (citations and internal quotation marks omitted).

**38.** *See Lindsey v. United States,* 911 A.2d 824, 833 (D.C.2006).

**39.** *Hairston v. United States,* 905 A.2d 765, 773 (D.C.2006) (citing *Jones v. United States,* 779 A.2d 277, 281 (D.C.2001) (internal quotation marks and other citations omitted)).

**40.** *See United States v. Perdue,* 8 F.3d 1455, 1466 (10th Cir.1993).

senger] in the car, [Mr. Green] said, here is my gun." Furthermore, we see nothing else in the record which suggests that Mr. Green's will was overborne in such a way that his statement must be deemed the product of coercion. He cites his age, but he was 21, an adult, not a susceptible juvenile. And, although he references the apparent statement of a pretrial services representative that he needed mental health services, the record is devoid of any indication that Mr. Green claimed coercion based on any mental condition.[41] In sum, given our review of the record and analysis, we conclude that the trial court did not violate Mr. Green's Fifth Amendment rights by denying his motion to suppress his statement.[42]

Accordingly, for the foregoing reasons, we affirm the trial court's judgment of conviction, but we remand this case for re-sentencing.[43]

*So ordered.*

---

**41.** *See Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (rejecting "a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' ").

**42.** *See Quarles, supra* note 25, 467 U.S. at 656, 659 n. 8, 104 S.Ct. 2626; *Dyson, supra* note 24, 815 A.2d at 369; *Estrada, supra* note 32, 430 F.3d at 611.

**43.** Mr. Green requests, and the government does not oppose, a remand for re-sentencing.

The trial court sentenced him under the District of Columbia Youth Rehabilitation Act ("DCYRA"), D.C.Code § 24–901 *et seq.* and, at the government's request, the trial court imposed mandatory minimum terms. In light of its review of the legislative history of the DCYRA, however, "the government ... [now] accedes to appellant's claim that the five-year mandatory minimum terms required by D.C.Code §§ 22–4502(a) and –4504(b) do not have to be imposed when sentencing under the DCYRA."